# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| Elizabeth Bucklew, | ) | C/A No.: 3:11-706-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Wal-Mart Stores East, L.P., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

In this employment discrimination case, Plaintiff Elizabeth Bucklew ("Plaintiff") is suing her former employer Wal-Mart Stores East, L.P. ("Defendant" or "Wal-Mart"). Plaintiff alleges failure to accommodate and constructive discharge claims pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq. ("ADA").

This matter comes before the court on the motion for summary judgment filed by Defendant on January 20, 2012. [Entry #25]. Plaintiff filed a response to the motion on February 6, 2012 [Entry #30], and Defendant filed a reply on March 1, 2012 [Entry #38]. The undersigned heard arguments of counsel at a hearing on this matter on April 3, 2012. The parties were granted leave to submit supplemental briefing by April 17, 2012, and both did so. [Entry #41, #42]. This motion for summary judgment having been fully briefed, it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and

recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the district court grant the motion.

I.  Factual and Procedural Background

On February 27, 2004, Defendant hired Plaintiff as a cashier. Am. Comp., ¶ 7 [Entry #9]. Plaintiff was employed as a Jewelry Associate[1] on October 28, 2006, when she suffered a serious injury to her ankle in an off-the-job accident. [Entry #25-4 at 2]. Defendant approved Plaintiff's requests for leaves of absence from the date of her injury through March 5, 2007. [Entry #25-5 at 92–93].

Plaintiff spent six to eight months after her ankle injury in a cast. Pl. Dep. 45:2–17. Upon her return after her accident, Plaintiff requested that she be allowed to use her cane and walker on the job, and Defendant approved the request informally. Pl. Dep. 45:17–49:18; 61:14–63:15. During this time, Plaintiff also used a wheelchair outside of work for her mobility impairment, but she did not request permission to use a wheelchair for work. Pl. Dep. 45:2–5; 49:19–22; 62:3–4.

In June and July 2007, Plaintiff requested a leave of absence, which Defendant approved. [Entry #25-5 at 9]. According to Plaintiff, Defendant reduced her hours over an eight-week period while she was working in the jewelry department. Pl. Dep. 55:1–11.[2]

---

[1] Although Plaintiff's testimony indicates that she was a Customer Service Manager ("CSM") at the time of her injury (Pl. Dep 41:21–23), documentation in her personnel record indicates that she had already started her position as a jewelry department associate [Entry #25-5 at 107]. Regardless, Plaintiff's job assignment at the time of her injury is not a material fact, as it is undisputed that Plaintiff voluntarily stepped down from her CSM position (Pl. Dep 44:7–24) and requested to be transferred to the jewelry department (Pl. Dep 48:17–18).

[2] Paperwork in Plaintiff's personnel file also reflects her request for a reduction in hours to only work on Saturdays and Sundays in August and September 2007. [Entry #25-5 at

Plaintiff continued to work as a Jewelry Associate during this time, satisfactorily performing her job duties. Dickert Aff., ¶ 10 [Entry #25-5 at 6]. Plaintiff testified that while she was working in the jewelry department, Store Manager Brian Dickert and the assistant managers made her feel like they would rather have an employee who did not need a cane and a walker to do the job. Pl. Dep. 50:2–7. Although she admits that they did not make any adverse comments, Plaintiff testified that they would smile and snicker at her when they went past her department.  Pl. Dep. 51:14–53:2.

In February 2008, Defendant approved Plaintiff's request for another leave of absence for February 2 through March 2, 2008. [Entry #25-5 at 89]. When she returned from leave on March 3, 2008, Dickert transferred Plaintiff to an Overnight Cashier position. [Entry #25-5 at 96]. Plaintiff began working as an Overnight Cashier on or about March 8, 2008, and she received a raise of $0.30 per hour based on this transfer. *Id*.

On April 20, 2008, Plaintiff submitted a written request to store management, pursuant to Defendant's ADA process, for an accommodation to be able to sit (i.e., utilize a stool at a register) as needed. [Entry #25-3 at 133]. Plaintiff listed her medical condition as "deep hardware in left ankle, chronic cellulitis," and stated that she "can't stand or sit for long periods of time." *Id*.  Defendant approved her accommodation request within the week. Pl. Dep. 66:8–67:9. Plaintiff worked as scheduled for the next several months and then requested and was granted a leave of absence for approximately seven weeks, from July 23 through September 10, 2008. [Entry #25-5 at 84–85].

---

62–63].  However, for the purposes of this motion, the undersigned views the facts in the light most favorable to Plaintiff and accepts as true her allegation that her hours were reduced for an eight-week period while she was in the jewelry department.

Plaintiff continued to work in a Cashier position for the next two months and then was granted another leave of absence at her request, from November 29 through December 6, 2008. [Entry #25-5 at 79–80]. Plaintiff was then absent from work from December 20, 2008 through December 31, 2008. Martin Aff. ¶ 5 [Entry #25-6 at 4]. On February 11, 2009, Plaintiff requested a leave of absence to excuse those otherwise unapproved absences. [Entry #25-6 at 54-57]. Plaintiff's leave of absence request revealed that she had not sought treatment from her physician until January 6, 2009 regarding her alleged need for leave in December. *Id*. Defendant did not approve the request because (1) Plaintiff did not submit her leave of absence request until nearly two months after her absences occurred, and (2) Plaintiff did not provide any explanation why she should be allowed additional time to submit her request for leave under Wal-Mart's policy or the law. *Id*.; Martin Aff. ¶ 5.

On January 25, 2009, Defendant provided Plaintiff with an annual evaluation for her position of Overnight Cashier. [Entry #25-5 at 103–05]. Although the evaluation noted that Plaintiff should try to reduce her absences and tardies, Plaintiff received a "meets" expectations rating, showing that Defendant deemed her job performance to be satisfactory and resulting in a raise for Plaintiff. *Id*. This was Plaintiff's last review prior to her resignation in July 2009.

On February 28, 2009, Plaintiff submitted to Dickert a written statement entitled "Statement of Harassment." [Entry #25-4 at 21–23]. Plaintiff claimed that on February 25, 2009, CSM Danielle Long and Lead CSM Phaedra Haynes embarrassed Plaintiff and all the other overnight cashiers by verbally admonishing them for standing around at their

registers and walking around talking and not working. *Id*. In the statement, Plaintiff accused Long and Haynes of also wasting time in more egregious ways, such as talking on the phone and eating on the clock. *Id*. Plaintiff's statement states that Long and Haynes met with her the following day and informed her that Defendant would not allow her to use the customer motorized shopping cart (also referred to as a "mart-cart") during her shift any longer, although she could continue using a stool at the register. *Id.* at 22. Plaintiff claims that, during this meeting, Long and Haynes suggested Plaintiff use Defendant's discount to join Gold's Gym and suggested she would feel better if she lost weight. *Id*.

Upon receiving Plaintiff's statement and meeting with her, Dickert contacted Market Human Resources Manager Michael Martin concerning Plaintiff's request to use the mart-cart. Dickert Aff. ¶ 16 [Entry #25-5]. Dickert also met with Haynes, the nightshift Lead CSM, to discuss the alleged rude comments she and/or Long had made to Plaintiff and requested that their communication be made in a softer manner. *Id*. at ¶ 15. Dickert met with Plaintiff and informed her that he had addressed her concerns and that she needed to complete a Reasonable Accommodation form to request to use a mart-cart for work. *Id*.

A few days later, on March 2, 2009, Plaintiff completed the Reasonable Accommodation form, requesting that she be allowed to continue using a stool at the register "to sit down at intervals" and to "allow [her] to use scooter-cart to put [her] freight at night as needed." [Entry #25-6 at 65–69]. Plaintiff noted on the form that the request to use the mart-cart was a "(*) new request" for accommodation. *Id*. Plaintiff's

doctor stated on the medical certification that: "P[atient] can lift and carry 10-20 lb items, but will need to use machinery/device to help with transport. Walking or standing for more than 30 minutes to an hour triggers or worsens leg pain, so she needs to be able to sit at intervals." *Id*. at 66.

According to Martin, he reviewed Plaintiff's Reasonable Accommodation request and approved Plaintiff's continued use of a stool, as it had been approved previously, but he was not able to approve the accommodation to use the mart-cart, as they were solely for mobility-impaired customers to use to enable them to shop in the store. Martin Aff. ¶¶ 7–9 [Entry #25-6]. Martin declares that when not in use by a customer, the carts must be charged so that they will be available and ready for the next customer. *Id*. Martin states that he instead offered Plaintiff an alternative accommodation for her mobility impairment, the use of her own assistive device, such as a wheelchair, walker, and/or cane which comported with her physician's recommendation. *Id*.

According to Plaintiff, on or about March 30, 2009, she began taking contemporaneous notes while at work and while on the clock. Pl. Dep. 113:15–114:16; [Entry #25-4 at 1–78]. This date coincides with the date that she contacted the EEOC inquiring about filing a charge. Pl. Dep. 21:16–17. Plaintiff's notes state that she spoke with Martin that day, and that the two of them discussed her mobility issues and recent request for accommodation. [Entry #25-4 at 25]. In her deposition, Plaintiff confirmed that Martin informed her that Defendant would accommodate her by allowing her to bring in her own mobility devices to use, including a motorized scooter. Pl. Dep. 155:6–157:7. Although her notes do not reflect it, Plaintiff testified at her deposition that she

also informed Martin that her stool had been hidden from her at times upon her arrival at work. Pl. Dep. 159:11–160:5. However, Plaintiff further testified that Martin resolved it: "[Martin] did make sure that . . . my stool was provided at my register." Pl. Dep. 160:4–5. According to Defendant, and undisputed by Plaintiff, she did not contact Martin again to report any issues with her stool or to submit additional accommodation requests. Martin Aff. ¶ 12 [Entry #25-6].

On April 13, 2009, Plaintiff filed an EEOC charge ("Charge"). [Entry #25-4 at 60]. The month after filing her Charge, in May 2009, Plaintiff reported allegations of inappropriate conduct (including a reduction in her hours, rude comments, and that she believed her stool was purposefully hidden) to Human Resources, and Defendant assigned Market Human Resources Manager Phil Wally to investigate. Wally Aff. ¶ 4 [Entry #25-7]; [Entry #25-4 at 9]. Wally interviewed Plaintiff, Dickert, CSM Long, CSM Haynes, CSM Lisa Belton, and CSM Barbara Gibbs, but was unable to corroborate that a violation of Defendant policy had occurred. *Id.*

On May 30, 2009, Defendant disciplined Plaintiff for violating policy when she admitted having worked overtime without authorization. Pl. Dep. 213:8–214:9. During her meeting with Dickert the next day, on June 1, Dickert told Plaintiff "not to worry, that everything was going to work out, and to let him know if she needed anything." Entry #25-4 at 35].

Plaintiff claims that when she arrived at work on June 2, 2009, she could not locate her stool and was without it for thirty minutes. *Id.* at 37. Plaintiff claims that the stool was again unavailable when she arrived at work on June 8, 2009, but that a manager

provided it to her within an hour and a half. *Id.* at 38–39. Plaintiff claims that the stool was unavailable again on her June 10 shift. *Id.* at 63. The next day, on June 11, 2009, Wally agreed to email Dickert to ensure that Plaintiff would have her stool. *Id.* at 41, 43. According to her own notes, Plaintiff's stool was available at her next scheduled shift. *Id.* Plaintiff did not report any further issues with her stool from June 11 through July 14, the day she resigned. Dickert Aff. ¶¶ 19, 23; Martin Aff. ¶ 12; Wally Aff. ¶ 5.[3] Plaintiff worked the following two weeks without any complaints. Dickert Aff. ¶ 23, Wally Aff. ¶ 5.

On June 28, 2009, Plaintiff did not report for her scheduled shift; instead, she called a manager to confirm her absence. [Entry #25-4 at 50]. The following day, she called out again but went by Wal-Mart to pick up a medical leave of absence packet. *Id.* Plaintiff visited her doctor on June 30, 2009, and he certified on Plaintiff's leave request form that she was completely incapacitated and unable to work from June 30 through July 17, 2009. [Entry #25-5 at 67]. Because Plaintiff had only three remaining days of FMLA eligibility at that time, Market Human Resources Manager Angela Soles approved the FMLA request for the first three days that Plaintiff's doctor had written her out of work – i.e., June 30, July 1, and July 2. *Id.* Plaintiff was then scheduled off of work from July 2 through 4, 2009. [Entry #25-4 at 50]. Plaintiff called out of work on July 5, 6, 7,

---

[3] Although at one point in her deposition Plaintiff claimed that her stool was missing numerous times during this period (Pl. Dep. 80:24-81:16, 84:2-24), Plaintiff admitted later at deposition that she accurately recorded in her notes the instances when the stool was unavailable at the start of her shift (Pl. Dep. 227:9-11). A review of her notes shows only these three occasions in June. [Entry #25-4]. The number of times stated in her own contemporaneous notes comport with her claim in the Amended Complaint that "on several days Plaintiff could not find the stool because Long hid it from her." Am. Compl. ¶ 10.

and 8, and confirmed those absences with a manager each time. *Id*. at 51. Plaintiff was then scheduled off work on July 9 and 10. *Id*. She called out again on July 11, 2009, and was scheduled off on July 12 and 13, 2009. *Id*.

On July 13, 2009, Plaintiff was notified that her FMLA request could only be approved for three days, as that was the limit of her remaining FMLA eligibility. Pl. Dep. 100:21–101:22. On the same day, Plaintiff met with Dickert at Wal-Mart and submitted a written accommodation request that stated:

> Store Manager Brian Dickert,
> My 10 pm – 7 am night time shift hasn't been productive for my overall health. My doctor has suggested that I take an <u>earlier shift</u> with <u>less hours</u>. I would like to request a part-time position as an up-front cashier on second shift's schedule. I hope that my request in writing will be able [sic] to have this accommodation request for second shift cashier position met once an opening becomes available.

[Entry #25-3 at 135]. According to Plaintiff, Dickert told her that her request needed to be sent to Corporate for consideration. Pl. Dep. 104:5–12.

Also on July 13, Plaintiff contacted the EEOC about her pending Charge. [Entry #25-4 at 53]. She expressly asked the EEOC investigator whether the EEOC would continue to pursue her Charge whether or not she decides to "continue [her] employment with Wal-Mart." *Id*. The EEOC confirmed to Plaintiff that it would continue to investigate even if she were no longer employed. *Id*. After confirming next steps with the EEOC if she were to decide to resign, Plaintiff submitted her resignation the next day, July 14, 2009.

II.     Discussion

A.      Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

B.     Analysis

1.     Failure to Accommodate Claim

In order to establish a prima facie case for failure to accommodate a disability under the ADA, a plaintiff must establish four elements by a preponderance of the evidence: (1) she was a qualified individual with a disability under the meaning of the ADA; (2) her employer had notice of her disability; (3) she could perform the essential functions of her job with reasonable accommodation; and (4) her employer failed to make such accommodation. *See Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001). Defendant does not appear to dispute that Plaintiff has shown the first three elements of her claim.[4] Therefore, the only remaining question on Plaintiff's failure to accommodate claim is whether Defendant failed to make a reasonable accommodation for Plaintiff such that she could not perform the essential functions of her job.

In order to determine appropriate accommodations, both the employer and employee have an obligation under the ADA to engage in the interactive process in order to determine appropriate accommodations for the employee. *Crabill v. Charlotte-Mecklenburg Bd. Ed.*, 423 F. App'x 314, 322–23 (4th Cir. 2011). Moreover, an employer is not required to provide an employee with the specific accommodations she requests, "but only with reasonable accommodation as is necessary to enable [her] to perform [her] essential functions." *EEOC v. Newport News Shipbuilding & Drydock Co.*, 949 F. Supp.

---

[4] Defendant argues that Plaintiff admitted through her sworn statements filed in conjunction with her application for social security disability benefits that she was not able to work, and therefore was not a qualified individual under the ADA as of July 14, 2009 (the onset date from Plaintiff's Disability Application). The undersigned discusses this issue in greater detail infra at section B.2.a. However, Defendant has not suggested that Plaintiff was not a qualified individual with a disability prior to July 14, 2009.

403, 408 (E.D. Va. 1996); *see also Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 484 (8th Cir. 2007) (an employer is not required to provide a disabled employee with an accommodation that is ideal from the employee's perspective, only an accommodation that is reasonable); *Trepka v. Board of Educ.*, 28 Fed.Appx. 455, 459 (6th Cir. 2002) ("The employer need not provide the accommodation that the employee requests or prefers. Instead, the employer retains the 'ultimate discretion' to choose another effective accommodation, even if less expensive or easier to provide. Accordingly, an employee is not entitled to a particular reasonable accommodation if another reasonable accommodation is provided." (citations omitted)).

Although the Fourth Circuit has not spoken on this precise issue in the ADA context, it appears the court would agree with the opinions cited herein from other Circuits, given its prior opinions on what constitutes a "reasonable accommodation" in religious discrimination cases. Specifically, the Fourth Circuit has held:

> [I]f an employer has provided a reasonable accommodation, we need not examine whether alternative accommodations not offered would have resulted in undue hardship. *Philbrook*, 479 U.S. at 68, 107 S.Ct. 367. In fact, "where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end." *Id.* This is because "the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Id.* Moreover, the employer need not provide the employee with his or her preferred accommodation. *See id.* (finding no basis "for requiring an employer to choose any particular reasonable accommodation"). Rather, so long as the employer has offered a reasonable accommodation, it has fulfilled its duty under Title VII. *See id.* at 68–69, 107 S.Ct. 367.

*E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312–13 (4th Cir. 2008); *see also Harmer v. Virginia Elec. & Power Co.*, 831 F. Supp. 1300, 1306–07 (E.D. Va. 1993) (holding that the plaintiff was not entitled to the precise accommodation requested where

employer had accommodated the employee in other ways and the plaintiff had presented no evidence that he was unable to perform the essential functions of his position or that his productivity was not comparable to that of other employees, which was contradicted by his positive performance evaluations).

Here, Plaintiff argues that Defendant failed to accommodate her by refusing to allow her to use one of its mart-carts when restocking. [Entry #30; #41]. Defendant maintains that the mart-carts were solely for mobility-impaired customers to use to enable them to shop in the store, and that when not in use by customers, these carts must be charged so that they will be available for the next customer. Martin Aff. ¶¶ 7–9 [Entry #25-6]. Plaintiff was allowed to use both a walker and a cane regularly during her employment, and Defendant informed her that she could bring in other mechanical devices to assist her with mobility, such as a personal standard or motorized wheelchair. *Id*. at ¶ 10.

Between her return to work in 2007 after her accident and her request to use a mart-cart on March 2, 2009, Plaintiff had been performing the essential functions of her job with the accommodations Defendant allowed, including using a walker, cane, and a stool during her shift. In accordance with Plaintiff's physician's recommendation, Martin explained to Plaintiff that she could utilize her own motorized cart (if she had one), her wheelchair, or any other mobility device to assist her in getting around the store. Plaintiff had been effectively performing her essential job functions even without a motorized cart or wheelchair up to and following her request to use a mart-cart. Martin Aff. ¶ 10; Dickert Aff. ¶¶ 18–20.

Additionally, after she was informed that she would not be permitted to use the customer mart-carts but could use her own mobility device, Plaintiff did not follow-up further with Defendant to request another alternative accommodation or otherwise appeal the decision. Martin Aff. ¶ 14; Dickert Aff. ¶¶ 19, 24. As such, Defendant had no reason to believe that the proposed alternative accommodation was insufficient for Plaintiff's needs, as Plaintiff continued to perform the essential functions of her position without incident and worked between 20 and 40 hours per week for the remainder of her employment, except while out on leaves of absence. Dickert Aff. ¶ 20.

Therefore, based on the evidence presented, the undersigned submits that Plaintiff has failed to show that Defendant did not provide her with a reasonable accommodation she needed to fulfill the essential functions of her job because: (1) Plaintiff was performing the essential functions of her job to Defendant's satisfaction without the use of a mart-cart; (2) Defendant offered Plaintiff a reasonable alternative accommodation of allowing her to bring in a personal use mobility device of her own (including a wheelchair, which her doctor indicated she had used for personal reasons since 2007); and (3) she did not continue the interactive process by informing Defendant that she believed the alternative accommodation was not effective or practical.

Plaintiff also claims she was denied a reasonable accommodation based on her July 13, 2009 request for job-restructuring or transfer to another shift. [Entry #30, #41]. Although these alleged requests for accommodations are not mentioned in the amended complaint [Entry #9] and Plaintiff's counsel stipulated in the April 3, 2012 motions hearing that the only failure to accommodate alleged is the denial of use of a mart-cart,

Plaintiff's counsel attempts to withdraw this stipulation in his supplemental briefing. [Entry #41]. The undersigned addresses these claims in the interest of completeness only, with the recommendation that Plaintiff's counsel not be permitted to withdraw stipulations entered on the record at the hearing.

Plaintiff first alleges Defendant failed to accommodate her July 13, 2009 request to transfer to another shift. However, by Plaintiff's own admission, this request was not denied; instead, Plaintiff was told to send the request through Defendant's corporate office, which she never did. Pl. Dep. 104:5–12. Plaintiff resigned the following day on July 14, 2009. As Plaintiff has not shown that she properly requested such an accommodation or that Defendant failed to make this accommodation, Plaintiff's claim of failure to accommodate based on her July 13, 2009 request for shift transfer must fail.

In addition, Plaintiff briefly mentioned in her deposition that she had requested to be exempted from the job responsibility to restock shelves (Pl. Dep. 226:12–25), which she now couches as a request for job-restructuring. [Entry #41]. Plaintiff has submitted no evidence that she made a written request for such an accommodation pursuant to Defendant's ADA policy. Plaintiff had previously made written requests for accommodations such as her requests for the use of a stool and the use of a mart-cart, and therefore was familiar with Defendant's policy. Therefore, because she has not shown she made a written request for an accommodation of job-restructuring pursuant to Defendant's ADA policy, of which she was well-aware, Plaintiff's claim of failure to accommodate based on a request for job-restructuring must fail.

## 2. Constructive Discharge

Plaintiff has also brought a claim for constructive discharge under the ADA. To prevail on this claim, Plaintiff must show that: (1) at the time of her resignation, she was a qualified individual with a disability; (2) her working conditions were objectively intolerable; and (3) Defendant, motivated by disability bias, acted with the intention that she would be compelled to resign. *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 186-87 (4th Cir. 2004). Because the constructive discharge theory is "so open to abuse by those who leave employment of their own accord," the Fourth Circuit has "insisted that it be carefully cabined." *Honor*, 383 F.3d at 187.

### a. Plaintiff Was Not a Qualified Individual on July 14, 2009

Defendant argues that Plaintiff has admitted, both in this case and in her sworn statements in her application for social security disability benefits ("Disability Application"), that she was unable to work as of the date of her resignation, July 14, 2009, and therefore was not a qualified individual with a disability on that date. During her deposition, Plaintiff testified to the following:

> Q: And you see the first sentence says, "Since July of 2009, I haven't been physically able to work due to ongoing health problems and mental illness." Is that your handwriting?
> A: Yes, sir, that's correct.
> Q: Was it actually July of 2009 when you first became unable to work?
> A: Correct.
> Q: Which is the time that you resigned from Wal-Mart, correct?
> A: Correct.
> Q: So you resigned from Wal-Mart when you became physically unable to work, correct?
> A: That's correct.

> Q: And you haven't applied for any other position since you left Wal-Mart,
> have you?
> A: No, sir.
> Q: Because you've been unable to work the whole time, right?
> A: Correct.

Pl. Dep 163:10–164:5.  In addition to her deposition testimony, Plaintiff's swore in her Disability Application that she was completely unable to work, unable to bathe or dress herself, prepare meals by herself, do any household chores, go anywhere without someone's assistance, and admitted to having agoraphobia and severe panic attacks. [Entry # 25-3 at 103-113].

The Supreme Court of the United States has explicitly held that filing for social security benefits does not necessarily preclude a court from finding that a terminated employee was able to fulfill his or her occupational duties as of the time of termination. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999). However, the Court also held:

> Nonetheless, in some cases an earlier SSDI claim may turn out genuinely to conflict with an ADA claim. Summary judgment for a defendant is appropriate when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." An ADA plaintiff bears the burden of proving that she is a "qualified individual with a disability"—that is, a person "who, with or without reasonable accommodation, can perform the essential functions" of her job. And a plaintiff's sworn assertion in an application for disability benefits that she is, for example, "unable to work" will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation. For that reason, we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation.

*Id.* (internal citations omitted).  Therefore, Plaintiff's application for and receipt of disability benefits is not dispositive of whether she can assert a claim under the ADA for

the same period. However, the *Cleveland* Court instructed that a plaintiff who has claimed to be totally disabled and has filed an ADA claim must have a good explanation of why these two disparate claims are not contradictory.

Here, Plaintiff has not made such a showing. Plaintiff argues that she did not swear in her application for social security benefits that she was unable to work if provide a reasonable accommodation. [Entry #41 at 4]. However, she provides no other explanation for her testimony in this case than that she resigned from Wal-Mart because she became physically unable to work. Pl. Dep 163:10–164:5. In addition, Plaintiff's statements in her Disability Application that she suffered from agoraphobia and severe panic attacks, was unable to bathe or dress herself, prepare meals by herself, do any household chores, or go anywhere without someone's support (e.g., transportation and assistance) contradict her present assertions that she was able to perform the essential functions of her job, even with her preferred accommodation, on July 14, 2009 and beyond. Therefore, the undersigned submits that Defendant is entitled to summary judgment on Plaintiff's claim for constructive discharge under the ADA because she was not a qualified individual on the date of her resignation.

b. Plaintiff's Workplace Was Not Intolerable

Additionally, Plaintiff has also failed to show that her work environment was intolerable. The determination of whether working conditions are intolerable is assessed using "the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign." *Goldsmith v. Mayor & City Council of Baltimore*, 987 F.2d 1064, 1072 (4th Cir. 1993); *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255

(4th Cir. 1985) ("[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge."). "The doctrine of constructive discharge protects an employee from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (citation omitted). "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* (citation omitted). "[A] workplace filled with . . . personal tensions" is not an intolerable one. *Honor*, 383 F. 3d at 187. Even an environment that includes yelling at an employee, criticizing her, publicly chastising her, and requiring her to work with an injured back does not render the environment so intolerable that a reasonable person would quit. *See Williams v. Giant Food Inc.*, 370 F. 3d 423, 434 (4th Cir. 2004).

Plaintiff claims that the following conduct created "intolerable" working conditions: Defendant's (1) denying part of her FMLA leave request in June 2009, (2) requiring her accommodation request go through the home office, (3) reducing her hours, (4) issuing her a "Coaching" (i.e., written summary and acknowledgment of discipline) (5) not having her stool available at the beginning of several shifts, and (6) allowing her co-worker's to make "rude" comments, including Long's alleged threats of job loss. *See generally* Pl. Dep. [Entry #30-1].

Defendant's denial of her leave request (after she had admittedly exhausted her FMLA leave), informing her that her July 13, 2009 accommodation request would need to go through Defendant's Home Office, and issuing her a Coaching (where Plaintiff

admits she had worked overtime without authorization), independently and together, fall far short of the requisite intolerable conditions that would compel a reasonable person to quit. Rather, they demonstrate nothing more than Defendant adhering to its own facially-neutral policies. Nor do these actions arise under circumstances otherwise suggesting an intolerable work environment. In fact, Plaintiff actually did not work the days for which she requested a leave of absence, and there is no evidence that she was disciplined or terminated for missing those days. Similarly, Plaintiff understood that her July 13, 2009 request for a schedule and shift change would not be immediately granted since availability needed to be considered. [Entry #25-3 at 135] (requesting a shift change "once an opening becomes available.") Further, Plaintiff had no reason to believe that her accommodation request to change shifts would be denied, considering Defendant's history of granting her similar requests. Nor could Plaintiff's May 2009 Coaching have risen to the level of intolerability required, as she admitted in her deposition testimony that she received the Coaching at issue because she had worked unauthorized overtime. Pl. Dep. 214:7–9.

Nor do Plaintiff's claimed incidents of her stool not being available at the beginning of some shifts, her reduced hours, or Long's and Haynes' comments to her constitute an intolerable work environment. Defendant assigned an HR manager to conduct an investigation into the incidents about which Plaintiff complained. Wally Aff. ¶ 4 [Entry #25-7]. Although he could not substantiate Plaintiff's claims of improper treatment, he still reminded those involved to adhere to Defendant's policies against discrimination. *Id*. Importantly, at no point after Wally conducted his investigation did

Plaintiff complain about any other allegedly inappropriate conduct. Therefore, Defendant appears to have resolved any issues upon receiving notice of the same from Plaintiff. Plaintiff has not provided any evidence to support even the existence of a hostile work environment (nor does Plaintiff so claim), let alone the more severe facts needed to support a claim for constructive discharge. *See Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004) (a constructive discharge claim "entails something more" than a hostile work environment claim). Therefore, while Plaintiff's allegations may show an unpleasant workplace, they are insufficient to establish constructive discharge as a matter of law. *Carter*, 33 F.3d at 459.

In fact, Plaintiff's own admissions in her statements to the EEOC and in her application for disability benefits make clear that she did not feel compelled to resign because her work environment was intolerable. Rather, Plaintiff admits in her statements to the EEOC that she deliberated resigning, indicating she felt as though she had a choice to resign. *Blistein v. St. John's Coll.*, 74 F.3d 1459, 1468 (4th Cir. 1996) (plaintiff asserting constructive discharge claim must have had "no choice but to resign") (emphasis omitted). Moreover, as discussed *supra*, Plaintiff's Disability Application makes clear that she resigned because she was "completely unable" to work as of July 14, 2009, due to her medical condition. Her doctor's instruction to do so further supports this position. Nowhere in Plaintiff's application for disability benefits does Plaintiff contend that her work environment played any role in her inability to work or her resignation. Furthermore, Plaintiff has requested reinstatement, which does not support her claim that

the workplace was intolerable. [Entry #9 at 6]. For all the foregoing reasons, Plaintiff has failed to show her workplace was intolerable.

  c.    Plaintiff Has Not Shown Discriminatory Intent By Defendant

In addition to establishing that her work environment was intolerable, Plaintiff must also establish that Defendant acted with a discriminatory intent to force her to resign. Defendant has proffered evidence that it had legitimate, non-discriminatory reasons for taking the actions that Plaintiff claims made the workplace intolerable. Plaintiff admits that she has no evidence that Dickert or other decisionmakers wanted her to resign, and she testified regarding Dickert's efforts to work with her during her employment to keep her employed. Pl. Dep. 108:24–109:24. Defendant's continued efforts to accommodate Plaintiff's medical conditions rebut that contention that it intended to force Plaintiff to resign. Therefore, because she has not set forth sufficient evidence on any of the elements for constructive discharge, the undersigned recommends Defendant be granted summary judgment on this claim.

III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendant's motion for summary judgment [Entry #25] be granted.

  IT IS SO RECOMMENDED.

*Shiva V. Hodges*

May 16, 2012                          Shiva V. Hodges
Columbia, South Carolina             United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).