IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| ELIZABETH BUCKLEW, | ) | C/A NO. 3:11-cv-706-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | **OPINION and ORDER** |
| v. | ) | |
| | ) | |
| WAL-MART STORES EAST, L.P., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Through this action, Plaintiff, Elizabeth Bucklew ("Bucklew"), seeks recovery from her former employer, Defendant Wal-Mart Stores East, L.P. ("Walmart"), for alleged violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq*. ("ADA"). Dkt. No. 9 (First Amended Complaint). Bucklew alleges two ADA causes of action. First, she alleges Walmart failed to provide reasonable accommodations that would have allowed her to work despite her disability. *Id.* ¶¶ 11-17. Second, she alleges Walmart constructively discharged her by "deliberately [making] her working conditions so intolerable as to induce Plaintiff to quit her employment." *Id.* ¶¶ 18-21. Under both causes of action, Bucklew seeks back pay, reinstatement or front pay, other compensatory and punitive damages.

The matter is before the court on Defendant's motion for summary judgment. Dkt. No. 25. For the reasons set out below, the motion is granted in full.

In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2)(e), DSC, this matter was referred to United States Magistrate Judge Shiva V. Hodges for pre-trial proceedings and a Report and Recommendation ("Report"). Magistrate Judge Hodges issued a Report on May 16,

1

2012, recommending that Walmart's motion be granted and summary judgment be entered on both of Bucklew's ADA claims. Dkt. No. 43. An attachment to the Report advised the parties of the procedures and requirements for filing objections and the serious consequences of failing to do so. Bucklew filed a timely objection.

**STANDARD**

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the court. *See Mathews v. Weber*, 423 U.S. 261 (1976). The court is charged with making a *de novo* determination of any portion of the Report of the Magistrate Judge to which a specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b). The court reviews the Report only for clear error in the absence of an objection. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (stating that "in the absence of a timely filed objection, a district court need not conduct a *de novo* review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.") (citation omitted).

**DISCUSSION**

Bucklew challenges the Report in full, arguing that there are genuine issues of material fact which preclude entry of summary judgment on either of her claims. For the reasons set forth below, the court rejects Bucklew's objections and grants Defendant's motion in full, adopting the reasoning of the Report as modified and supplemented herein. For purposes of this discussion, the court applies the familiar summary judgment standard, which is correctly set forth in the Report. Dkt. No. 43 at 10.

**I.     Scope of Failure to Accommodate Claim**

Bucklew's amended complaint identifies two forms of accommodation she sought and alleges Walmart failed to provide: allowing her to sit on a stool at her cash register; and allowing her to use a motorized shopping cart ("Mart Cart") "when required to walk to other locations in the store." Dkt. No. 9 ¶¶ 7. In responding to Walmart's motion for summary judgment, Bucklew sought to expand the bases for her failure to accommodate claim. During oral argument, the Magistrate Judge pressed Bucklew's counsel regarding the expanded allegations. In response, Bucklew's counsel stipulated that Bucklew was relying solely on Walmart's failure to allow use of a Mart Cart in support of her claim for failure to accommodate her disability.

The Magistrate Judge allowed post-hearing supplemental briefing on specific points. Through her supplemental brief, Bucklew attempted to withdraw her stipulation and expand the bases for her failure to accommodate claim. Dkt. No. 41 at 1. The Report recommends that the court bind Bucklew to her stipulation. Dkt. No. 43 at 14-15. The court adopts this recommendation as it would be unfair to allow Bucklew to expand the allegations of her amended complaint after the close of discovery or to recapture claims affirmatively withdrawn at oral argument.[1] Even if allowed, the expanded bases would fail to support Bucklew's claim for failure to accommodate for reasons addressed in the Report. Dkt. No. 43 at 15.

---

[1] Bucklew presumably abandoned any claim that Walmart failed to accommodate her request to use a stool at her register because the evidence clearly establishes that Walmart granted this request. *E.g.*, Dkt. No. 44 at 4 (conceding Walmart approved Plaintiff's request to "be allowed to sit on a stool at the cash register to accommodate her inability to stand on her injured leg") (citing Bucklew dep. at 66-67); *Id.* at 5 (citing Bucklew dep. at 54-55, 63-64). Moreover, while the stool may not always have been available at the start of Bucklew's shift (and for reasons which may suggest interference by individual employees), Bucklew has failed to proffer any evidence either that Walmart ever withdrew approval of this accommodation or that Walmart managers failed to respond promptly when Bucklew raised concerns about non-availability of the stool.

3

**II.     Failure to Allow Use of a Mart Cart**

Bucklew used a Mart Cart from time-to-time in the performance of her job (to transport herself and merchandise) prior to being told not to do so in February 2009.[2]  She was first given this instruction by assistant manager BJ Upton, and later by two customer service managers ("CSMs"), Danielle Long ("CSM Long") and Phaedra Haynes ("CSM Haynes").[3]     Dkt. No. 30-1 at 21-22 (Bucklew dep. at 74-78) (testifying that manager "BJ [Upton]" and CSMs Long and Haynes told her she could not use the Mart Carts because they were provided solely for use by customers); *Id.* at 40 (Bucklew dep. at 148) (discussing instructions from Upton).  Prior to or around the same time that Bucklew was given these instructions, store manager Brian Dickert ("Dickert") discussed the matter with Michael Martin ("Martin"), the human resources manager with responsibility for the store where Bucklew worked.  Dkt. No. 25-6 at 5 ¶ 6 (Martin affidavit stating that he advised Dickert that Bucklew should not be allowed to use a "Mart Cart . . . while on the clock to perform her job duties" because the Mart Carts were provided "solely as a courtesy to mobility-impaired customers" and suggested that Upton provide Bucklew with a "Request for Accommodation Packet" so that she could seek any necessary accommodation); Dkt. No. 25-5 at 9 ¶ 16 (Dickert affidavit discussing same conversation).[4]   Bucklew submitted a formal request to be allowed to use a Mart Cart as an

---

[2]  For purposes of this order, the court accepts that Bucklew was disabled at the relevant time by a combination of her weight and an ankle injury which required her to use a cane, walker, wheelchair or other mobility-assistive device.

[3]  CSMs are hourly employees with limited supervisory authority.  Dkt. No. 25-5 at 5 ¶ 8 (Dickert aff.).  They may make recommendations but "do not have any authority to hire, fire, or make other significant employment decisions" regarding other employees.  *Id.*

[4]  Walmart asserts that the carts needed to be plugged in to recharge when not in use by customers, including during third-shift when Bucklew was working. *E.g.*, Dkt. No. 25-5 at 9 ¶ 16. Bucklew conceded that the Mart Carts needed to be recharged when not in use. Dkt. No. 30-1 at 42 (Bucklew dep. at 157-58). Nonetheless, for purposes of this order, the court will assume there are genuine issues of material fact whether allowing Bucklew to use a cart to the extent necessary during

4

accommodation in early to mid March 2009. Dkt. No. 30-1 at 37-38 (Bucklew dep. at 137-41) (discussing request to use Mart Cart); Dkt. No. 25-6 at 6 ¶ 7 (Martin aff. discussing Bucklew's request for accommodation); Dkt. No. 25-5 at 9 ¶ 17 (Dickert aff. stating that Bucklew returned the completed report on or about March 13, 2009); Dkt. No. 25-6 at 63-69 (request for accommodation dated March 2, 2009, with supporting medical statement dated March 11, 2009). Bucklew's request was supported by a medical certification which stated that Bucklew could "lift and carry 10-20 lb items, but will need to use machinery/device to help with transport." Dkt. No. 25-6 at 63-69 (also indicated that Bucklew's pain would be triggered or worsened if she was required to stand or walk for more than 30 minutes to an hour). While the medical certification indicated that Bucklew needed machinery or a device to help with transporting items she was required to lift or carry, it did not indicate that the machinery or device needed to be motorized. Neither did it indicate that the machinery or device needed to be capable of transporting *both* the items to be carried *and Bucklew herself*.

Walmart denied Bucklew's request to use a Mart Cart, noting that these carts were provided for the convenience of customers, but recommended as an alternative that Bucklew provide and use her own "assistive device." *E.g.*, Dkt. No. 25-6 at 68 (form reflecting decision); Dkt. No. 25-6 at 7 ¶ 10 (Martin aff. regarding his communication with Bucklew regarding the denial); Dkt. No. 30-1 at 42 (Bucklew dep. at 155-56) (conceding that Martin advised her she could bring in her own mobility assistive device).[5] Martin avers that he advised Bucklew she was welcome to bring and use

---

her shift would have interfered with availability of fully charged carts during other shifts when usage was higher.

[5] Bucklew denied receiving the fully completed form denying her request to be allowed to use the Mart Cart. Dkt. No. 30-1 at 38 (Bucklew dep. at 139). She, nonetheless, conceded that she

her own wheelchair or scooter and suggested other alternatives such as attaching a basket to Bucklew's walker or wheelchair or using a regular shopping cart, all of which Bucklew rejected, insisting that she should be allowed to use a Mart Cart. Dkt. No. 25-6 at 6 ¶ 10. Bucklew concedes that Martin suggested that she could use her own wheel chair or scooter and that she insisted that Walmart should allow her to use the Mart Cart (because it would not be an inconvenience to Walmart), but denies that they discussed other alternatives. Dkt. No. 30-1 at 42-43 (Bucklew dep. at 155-59).

Martin averred that Bucklew did not seek to discuss the matter with him further after this discussion, did not appeal his decision despite being told she could do so, and did not provide any further medical documentation. Dkt. No. 25-6 at 9-10 ¶ 11, 14. Bucklew has presented no evidence to the contrary. *See generally* Dkt. No. 30-1 at 43 (Bucklew dep. at 159 (stating she and Martin did not discuss other possibilities other than that she could bring in her own assistive device)).[6]

According to the EEOC's own guidelines:

> There are several modifications or adjustments that are not considered forms of reasonable accommodation. An employer does not have to eliminate an essential function, *i.e.*, a fundamental duty of the position. This is because a person with a disability who is unable to perform the essential functions, with or without reasonable accommodation, is not a "qualified" individual with a disability within the meaning of the ADA. Nor is an employer required to lower production standards– whether qualitative or quantitative– that are applied uniformly to employees with and without disabilities. However, an employer may have to provide reasonable accommodation to enable an employee with a disability to meet the production standard. While an

---

was informed of the denial and had a phone conversation with Martin regarding the denial. *Id.* at 41-42 (Bucklew dep. at 152-22)..

[6] The only evidence Bucklew presented that she made any effort to follow up or seek an alternative accommodation is her testimony that she asked her supervisors or managers to modify her job description so that she was not required to do any restocking, which request was denied. Dkt. No. 30-1 at 59-60 (Bucklew dep. at 226-27). She does not suggest that she put this request in the form of a formal request for accommodation. She also concedes that she never considered the alternative of putting a basket on her own wheelchair to use for restocking. *Id.*

employer is not required to eliminate an essential function or lower a production standard, it may do so if it wishes.

An employer does not have to provide as reasonable accommodations personal use items needed in accomplishing daily activities both on and off the job. Thus, an employer is not required to provide an employee with a prosthetic limb, a wheelchair, eyeglasses, hearing aids, or similar devices if they are also needed off the job. Furthermore, an employer is not required to provide personal use amenities, such as a hot pot or refrigerator, if those items are not provided to employees without disabilities. However, items that might otherwise be considered personal may be required as reasonable accommodations where they are specifically designed or required to meet job-related rather than personal needs.

*See* EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC Notice No. 915.002 (October 17, 2002) (under heading "General Principals" and subheading "Reasonable Accommodation") (last accessed on June 18, 2012 at www.eeoc.gov/policy/docs/accommodation.html#undue) (excerpt attached).

While not determinative, this guidance supports Walmart's denial of Bucklew's request to be allowed to use a Mart Cart because she conceded she needed and used a cane, walker, and her own wheel chair when away from work, and also used devices similar to the Mart Cart when doing her own shopping. The wording of Bucklew's supporting medical statement further supports the reasonableness of Walmart's denial of Bucklew's request given that it refers only to the need for some "machinery/device to help with transport" of items Bucklew needed to lift and carry as part of her job. Nothing in this statement is inconsistent with allowing Bucklew to use her own manual wheelchair (with a basket attached) or even a regular shopping cart (which she could push) as a reasonable accommodation.[7] Beyond her own opinion that she needed to use the Mart Cart, Bucklew

---

[7] The medical certification also states that "[w]alking or standing for more than 30 minutes to an hour triggers or worsens [Bucklew's] leg pain, so she needs to be able to sit at intervals." Thus, a reasonable reading of the medical certification suggests that, if allowed to sit on her stool at the register, Bucklew should have been able to handle the merchandise returns and related tasks so long as she had some device to assist in transporting the goods (for example, a regular grocery cart) and could accomplish the standing and walking portions of the task within thirty minutes to an hour.

has failed to present evidence that these alternatives would not have sufficed or that she requested or considered them. Under these circumstances, and in light of Bucklew's failure to provide greater medical documentation, to continue the interactive process of looking for an alternative solution, or to appeal the denial of the required accommodation, the court concludes that Bucklew's claim for failure to accommodate fails as a matter of law.

### III.     Constructive Discharge Claim

As explained in the Report, to make out a claim for constructive discharge, Bucklew must establish the following three elements: (1) she was a qualified individual with a disability at the time of her resignation; (2) the working conditions were objectively intolerable, and (3) Defendant, motivated by disability bias, acted with the intention that she resign. *Honor v. Booz-Allen & Hamilton, Inc.,* 383 F.3d 180, 186-87 (4th Cir. 2004). Bucklew faces difficulties with all three elements, at least the second of which is fatal to her claim.

####     A.     Qualified Individual Status.

The Report recommends that the court find Bucklew was not a qualified individual on the date she resigned her employment, July 14, 2009, thus defeating the first element of her claim for constructive discharge. This recommendation rests on Bucklew's repeated testimony in this action that she resigned from Walmart when she became physically unable to work and statements Bucklew made in documents submitted in support of her application for Social Security disability benefits.[8] The latter included the following statement:

---

[8] While it is not entirely clear when Bucklew submitted her application for Social Security disability benefits, the dated portions of her application indicate that the submission occurred sometime between January 6, 2011, and April 30, 2011. *See* Dkt. No. 25-3 at at 125 (Vocational Rehabilitation section of "Disability Report– Adult" dated January 6, 2011); *id.* at 116 (Function Report–Adult dated April 30, 2011).

> Since July of 2009, I haven't been physically able to work due to ongoing health problems and mental illnesses. My husband still helps me bathe, do laundry, do laundry, cook, clean house, do all my shopping and driving. My depression, anxiety and bi-polar [disorders] have been greatly effected [sic] by my disability!

Dkt. No. 25-3 at 103 (undated work history report); *see also* Dkt. No. 30-1 at 44 (Bucklew dep. at 163-64) (confirming statement in application, inability to work since July 2009, and failure to seek any other position since leaving Walmart based on inability to work).[9]

The Report also notes specific statements in the Function Report portion of Bucklew's application for disability benefits, signed April 30, 2010, that Bucklew was unable to take care even of her own personal needs such as bathing, dressing, cooking, or going anywhere by herself. Dkt.

---

[9] On an undated "Medical and Job Worksheet–Adult," Bucklew listed the following conditions as limiting her ability to work: "High cholesterol, obesity, diabetes, high BP, lymphedema, acid reflux, vertigo attacks, osteoarthritis, chronic pain, chronic cellulitis, chronic yeast infections, bi-polar, severe depression, emotional stress, OCD, binge eating, post traumatic stress disorder, panic disorder with agoraphobia, [and] permanent [left] ankle impairment." Dkt. No. 25-3 at 104. Immediately below this list, Plaintiff gave the date of July 14, 2009, as the "[d]ate [she] became unable to work because of [her] medical condition." *Id.*

In the Vocational Rehabilitation Section of her Disability Report–Adult (dated January 6, 2011), she described her condition as follows:

Obesity-Binge Eating, Depression, lack of energy, shortness of breath, tired all the time. Diabetes/High Blood Pressure–causes extreme fatigue and due to my mental conditions the meds prescribed side effects cause severe drowsiness. To go along with my mental conditions I also have a permanent impairment in my [left] leg which now causes lymphadema [sic] and chronic cellulitis which has caused me to be wheelchair bound. I'm able to walk but can only stand for 5-10 mins without triggered pain. Due to all the medicines I am on and due to all of my physical [and] mental illnesses I can no longer work. Please note that I even struggle with regular daily chores, such as: laundry, dishes, trash, bathing, and have been unable to drive due to severe panic attacks, and even have trouble leaving my house because of my agoraphobia and panic disorder. For the record may husband helps me by doing household chores, shopping and also helps me bathe.

Dkt. No. 25-3 at 125.

9

No. 43 at 18 ).[10]  The portion of the disability application which was signed on January 6, 2011, contains similar though less detailed comments. *Supra* n.9.

In her objection, Bucklew argues that her prior sworn statements regarding her inability to work are not sufficient to defeat her claim for constructive discharge because she never denied that she was "able to work if an employer will accommodate her standing and walking limitations." Dkt. No. 44 at 13. Bucklew relies, in particular, on her February 2, 2012 affidavit in which she avers as follows:

> *I could still be employed* by Wal-Mart and do my job [at] an "exceeds expectation[s]" level if they had accommodated my inability to walk without pain or assistance. . . .

---

[10] In the "Function Report–Adult," Bucklew described the "illnesses, injuries, or conditions [that] limit [her] ability to work" as follows:

> I'm unable to stand for more than 10 minutes without triggered pain, shortness of breath due to obesity, due to my surgery's [sic] I now have permanent lymphedema and cellulites [sic] which is chronic. I have also been diagnosed with bi-polar, depression, and panic attacks disorder. Due to all the health issues stated above, I am completely unable to work. I would also like to note that due to my severe panic disorder, severe bi-polar and depression, I'm unable to concentrate[.]

*Id.* at 109. *See also id.* at 110 (describing her day as eating a breakfast prepared by her husband, getting bathed by her husband, and "sitt[ing] in my wheelchair and stay[ing] depressed" and stating that "even doing the smallest tasks I'm easily tired-out. My husband takes care of me and has to do all the household chores.")

Finally, in the remarks section, Bucklew stated:

> Due to all of my medical problems[,] physical and mental illnesses[,] the medications taken for these conditions keep me from being able to work due to the side effects such as drowsiness, dizziness and diarreha [sic] and I have trouble staying focused on small tasks, and get overwhelmed very quickly. I have my own car in which I don't drive due to medication side effects and severe panic disorder (attacks)[.] Every day my body is racked with physical and emmotional [sic] pain. My lymphedema keeps me from a lot of daily routines because my legs are so heavy with fluid I can't even walk or stand long.

*Id.* at 116.

> I have not attempted to find other employment because I do not think any employer will hire me with my walking and standing limitations. To apply for employment, I would be required to use a cane or wheel chair. As a result, I applied for and am receiving social security disability. However, *if an employer will accommodate my walking and standing limitations I am able to work.*

Dkt. No. 30-2 (Bucklew affidavit) (emphasis added).

While it may be possible to reconcile some of Bucklew's sworn statements with her present position, it is not possible to reconcile all of them. For example, the court might accept that Bucklew's claim in her April 30, 2011 application for Social Security disability benefits that she had been unable to work since July 2009 and related deposition testimony in this action were intended only to claim an inability to perform her job with Walmart *absent the desired accommodations* (use of a stool and Mart Cart). Bucklew's detailed statements on her social security application regarding her inability to take care of her own personal needs might also be construed to refer to difficulties which developed between the time she resigned from Walmart in July 2009 and when she filled out the various portions of her Social Security application between early January 2011 and late April 2011. It is not, however, possible to reconcile Bucklew's February 2012 affidavit claiming a continued ability to work with her detailed assertions to the contrary found in the various documents she signed between January 2011 and April 2011 in support of her application for Social Security disability benefits.[11] The inconsistencies between Bucklew's affidavit and disability application are

---

[11] Bucklew's deposition testimony regarding the dates when she became disabled and when she applied for and received Social Security disability benefits is quite confusing. For example, at one point she testified that she became unable to work in January 2010 and qualified for Social Security disability benefits on February 8, 2011. Dkt. No. 30-1 at 43 (Bucklew dep. at 161-62). She also indicated that her condition had become progressively worse over the years. *Id.* When later confronted with the disability date stated in her Social Security application, she testified that she had been unable to work since July 2009, when she resigned from Walmart. *Id.* at 44 (Bucklew dep at 163-64). She then clarified that she *applied* for Social Security benefits in February 2011, but would not receive her first check until November 9, 2011. *Id.* (Bucklew dep. at 165). *See also id.* at 45 (Bucklew dep at 169-70) (conceding she told the Social Security Administration she had been unable

11

particularly troubling as Bucklew has not only sought but, apparently, has been receiving Social Security benefits since no later than November 2011 based on her claims of total disability including an inability to care even for her own personal needs. *Supra* n.**[currently 11]**.

At the least, Bucklew's sworn statements in her application for Social Security benefits preclude her from claiming a continued ability to perform her job at Walmart, with or without accommodation, after January 6, 2011, the date she signed the Disability Report–Adult. Thus, these statements permit the court to disregard Bucklew's entirely inconsistent claim in her February 2012 affidavit that she could still perform her job with Walmart if provided the requested accommodation. It follows that Bucklew cannot claim that she has been a qualified individual at any point after January 6, 2011, which would limit both the available damages and any right to reinstatement.

Whether Bucklew's various inconsistent statements preclude a finding that she was a qualified individual in July 2009 presents a closer question. As noted above, read as a whole, Bucklew's deposition suggests her subjective belief, at the time of her resignation, that she could continue to perform her job if she had received the requested accommodation. Testimony from her managers, moreover, indicates she was continuing to perform adequately up to the date she took medical leave even without the use of the Mart Cart.[12] Dkt. No. 25-5 at 11 (Dickert Aff. ¶ 20). Thus,

---

to work since July 2009, but claiming she "still could do my job today if I had a stool at my register," but then restating that she had been unable to work since July 2009 "in any capacity").

[12] Several months after her request to use the Mart Carts was denied, Bucklew took a medical leave. This leave began on June 26, 2009, and ended with her resignation on July 14, 2009. Dkt. No. 25-5 at 11-12 (Dickert aff. ¶¶ 22-23. In the interim, Bucklew sought approval of the leave under the Family Medical Leave Act. *Id.* The initial portion of the leave was approved under the FMLA but the latter part was not because Bucklew had exceeded the maximum number of days available. *Id.* Bucklew's store manager, Dickert, avers that he did not intend to take any adverse action against Bucklew despite her leave continuing beyond the time allowed under the FMLA. *Id.* ¶ 22. Bucklew has not proffered any evidence to the contrary. That Bucklew met with her store manager on July 13, 2009, to request a transfer to a part-time position on a different shift for medical reasons suggests

while her later statements may reflect on her credibility, they may not preclude a finding that she remained a qualified individual in July 2009 when she resigned. The court need not, ultimately, decide whether the inconsistencies in Bucklew's position preclude a finding that she was a qualified individual with a disability at the time of her resignation because her constructive discharge claim fails on other grounds as explained below.

### B.     Insufficient Evidence of Intolerable Conditions

For reasons explained in the Report, the court finds that Bucklew's working conditions, even if less than ideal, were not objectively intolerable. Beyond the accommodation issue addressed in her first cause of action, the allegedly intolerable conditions consisted primarily of alleged mean-spirited comments (regarding weight and disability) and occasional interference with the availability of the stool which was to be placed at Bucklew's register.

Bucklew alleges these comments were made and actions taken primarily by CSM Long who Bucklew claims began harassing her on February 25, 2009. Dkt. No. 30-1 at 47 (Bucklew dep. at 178). The alleged harassment included telling Bucklew, in front of customers and co-workers, to "get [her] fat ass off the stool and work" or she would be fired. *Id.* at 53 (Bucklew dep. at 202). Bucklew also alleges that on this or another occasion Long suggested Bucklew should lose weight, and made comments about getting Bucklew's "fat ass off the motorized cart" and that Long would

---

that she understood no adverse action was contemplated. *Id.* ¶ 7. While Dickert was not able to immediately grant Bucklew's request, he avers that he advised her he would pursue the request with the Accommodation Service Center. *Id.* Bucklew testified similarly, that Dickert stated "[h]e couldn't accommodate [Bucklew's] request and that everything would have to go through home office." Dkt. No. 30-1 at 29 (Bucklew dep. at 104). Bucklew resigned the next day, July 14, 2009, before any further action could be taken on her request for a transfer. Dkt. No. 25-5 at 12 ¶23. Notably, Bucklew's written request for a transfer made no mention of any concern with the previously requested accommodations or treatment by her coworkers. Dkt. No. 25-3 at 135. Her resignation letter, likewise, made no mention of these or any other concerns.

13

"be the one to fire" Bucklew. *Id.* (Long did not, of course, have the power to fire Bucklew, although she may have had some input into such a decision.).

Bucklew also testified that Long hid her stool from her on a number of occasions, ultimately resulting in Bucklew's loss of approximately 20 hours of work. Dkt. No. 30-1 at 46 (Bucklew dep. at 172). For the most part, Bucklew's testimony regarding Long hiding her stool is based on hearsay and supposition. *See, e.g.*, *id.* at 60 (Bucklew dep. at 228-29) (stating she knew Long had hidden her stool because she could not find it); *id.* at 50-51 (Bucklew dep. at 189-91) (stating another employee told Bucklew she saw Long taking the stool to the accounting office); *id.* at 23 (Bucklew dep. at 81 (stating other employees told her Long hid her stool in the accounting office). On one occasion, Long brought Bucklew the stool after Bucklew had been at work for two hours, laughing and stating "were you looking for this?" *id.* at 24 (Bucklew dep. at 83). Of course, there are other explanations for why the stool was not at the management podium where Bucklew states it was to be kept when she arrived for work. *See* Dkt. No. 25-5 at 10 ¶ 18 (Dickert aff.) ("When the stool was not in use, [it] was stored off the salesfloor and away from the Front End for safety reasons and to ensure Associates, customers, and the like did not use the stool for unapproved reasons."). Nonetheless, for present purposes the court accepts that the stool was intentionally hidden from Bucklew.

Even with this assumption, the resulting inconvenience is not enough to support a finding of intolerable working conditions forcing Bucklew's resignation. Bucklew testified that she advised Martin (Human Resources) and others of her concerns regarding the missing stool. Dkt. No. 30-1 at 24 (Bucklew dep. at 85). She concedes that she "got the stool back" after she filed EEOC charges. *Id.* Those charges were filed in March 2009, the same month she discussed the matter with Martin. *Id.* at 43 (Bucklew dep. at 160). She concedes Martin "handled the situation" and made sure her

stool was available at her register, but states the problem started back up again a week later. *Id*. Bucklew has not, however, proffered evidence sufficient to show that the stool was missing more than a few times between Martin's intervention (in March 2009) and her resignation (on July 14, 2009). Instead, she testified that her contemporaneous notes reflected when there were problems. *Id.* at 60 (Bucklew dep. at 227) (first stating she recorded every instance in which her stool was hidden, then, when confronted with the existence of only three incidents, stating that she must not have written down every instance). Those notes indicate her stool was missing upon her arrival for work on three days, June 2, 8, and 10, and that she discussed the missing stool with management representatives on June 11 and 12.[13]

Even if the stool was missing for some portion of Bucklew's shift on each of these five days, it would not support a claim of intolerable working conditions as Bucklew testified that the underlying problem (a missing authorization) was resolved by Phil Wally in Human Resources on June 13. *Id.* at 14 (noting that stool was placed back at the register after Wally's intervention). Bucklew does not report any further missing stool incidents between June 13 and June 30, 2009, when she submitted a medical leave request based various medical problems and her doctor's recommendation that she be on complete bed rest.[14] Thus, even if a missing stool for some portion

---

[13] A chronology Bucklew appears to have prepared after the fact (apparently in support of her EEOC charge) arguably suggests five instances in which her stool was missing upon her arrival. Her contemporaneous notes, however, suggest the stool was missing only on June 2, 8 and 10. *Compare* Dkt. No. 25-4 at 12-14 (chronology referring to a missing stool on June 2, 8, 10-12); *with* Dkt. No. 25-4 at 37-43 (contemporaneous notes indicating stool missing for some portion of shift on June 2, 8, and 10, and conversations with human resources regarding the missing stool on June 11 and 12).

[14] *See* Dkt. No. 25-4 at 16 (stating in chronology "[d]ue to my own serious health conditions[,] I had to apply for another [FMLA] leave"); *id.* at 48 (stating in notes "[p]er Doctor's order I've requested another leave of absence to improve my health. . . . My Doctor requested bed rest, and elevation of legs due to lymphadema."); *id.* at 50 (stating in notes "[m]y Doctor has put me

of some of her shifts made her work intolerable, that problem was remedied over two weeks prior to her last day at work and a month prior to her resignation (following a period of medical leave). It follows that any discomfort caused by the intermittently missing stool cannot support a claim for constructive discharge.

The alleged comments made primarily by CSM Long, if true, were mean spirited and may have made the workplace intermittently unpleasant.[15] They were not, however, so severe as to make Bucklew's working conditions intolerable. This is particularly true as to the various vague comments Bucklew references and comments which were remote in time to her resignation.[16] In any event,

---

on complete bed rest due to high blood pressure, hypertension, lymphadema, and chronic pain along with chronic cellulitis. The duration of my leave of absence is from 6/30/09 until 7/17/09. . . . I told Louise [in personnel] that this request needed to be approved due to Doctor's orders, and my own serious health condition's [sic].").

[15] In May 2009, Walmart human resources manager Phillip Wally investigated Bucklew's allegations that CSMs Long and Haynes had made inappropriate comments to or about Bucklew on or after February 26, 2009. Some of these comments allegedly related to Bucklew's weight and disabilities. *See* Dkt. No. 25-7 at 3 ¶ 4 (Wally aff.). Wally avers that he interviewed Bucklew and all of the alleged witnesses, the store manager, and four CSMs including Long and Haynes. *Id*. According to Wally, the witnesses "categorically denied ever witnessing or hearing Ms. Long, Ms. Haynes, or anyone make any inappropriate comments to or about Ms. Bucklew." *Id*. With regard to comments about exercise, Long and Haynes "explained that their comments were solely made based on compassion and concern for Ms. Bucklew's health and well-being." *Id.* Wally concludes that his investigation "did not substantiate any violations of Walmart's policies." *Id.* He, nonetheless, took "the opportunity to reiterate Walmart's policies relating to discrimination and harassment, respect for the individual and the open door. I also reminded everyone that retaliation is strictly prohibited." *Id.* Bucklew conceded that Wally conducted an investigation and stated that she did not know "whether. . . a thorough investigation was done." Dkt. No. 30-1 at 53 (Bucklew dep. at 201). She opined that an adequate investigation was not done because she was not informed of the outcome and "things would have changed" if a proper investigation was done. *Id.* (Bucklew dep. at 201-02). Bucklew has not, however, offered any evidence that Wally's investigation was not performed in good faith or was less than thorough. Neither has she presented any evidence that his conclusion did not represent his honest evaluation of the evidence.

[16] Bucklew, for example, testified that she perceived two managers "smirked" at her when she worked in the jewelry department. Her work in this department ended long prior to her resignation.

16

Bucklew does not report any inappropriate comments in her contemporaneous notes during the last few weeks she was actually at work. Instead, her notes refer to the intermittently missing stool (prior to June 13, 2009), excessive heat in the store, an unfavorable register placement, inconvenience caused by a bomb threat, scheduling problems, and various aggravations of the work day. Dkt. No. 25-4 at 40-50 (notes for June 9, 2009–June 30, 2009). As with the intermittently missing stool, these incidents do not support an inference that Bucklew was forced to resign due to an objectively intolerable workplace.

### C.    Absence of Evidence of Disability Bias by Walmart

As noted above, the working conditions which Bucklew alleges made her job intolerable consisted primarily of comments and actions by two CSMs. Of the two, Bucklew alleges that Long was the primary actor.[17] In her deposition, Bucklew testified that Long was motivated by jealousy because Bucklew was better liked and, possibly, fear that Bucklew might get Long's job as Bucklew had previously served as a CSM. Dkt. No. 30-1 at 54 (Bucklew dep. at 105-06). Despite being pressed, Bucklew did not attribute Long's alleged mean-spirited actions to disability bias. *Id.*[18] In other words, Bucklew alleges that Long was *motivated* by jealousy and expressed that animosity by

---

[17] The primary allegations relating to Haynes are that she was one of the managers who told Bucklew she could not use the Mart Cart and who also suggested Bucklew consider a Gym membership. The latter conversation either implied or included comments regarding Bucklew's weight. Both conversations occurred in February 2009.

[18] As to Haynes' possible motivation for sometimes joining in on Long's negative comments or other allegedly harassing actions, Bucklew stated that she had no idea of its source "other than the fact she felt as though I wasn't doing a good job or the same kind of work I used to do when I was a customer service manager and was able to run the whole store. She perceived me differently [because of my disability]. That's what the problem was." Dkt. No. 30-1 at 55 (Bucklew dep. at 107). Haynes' alleged comments are, however, too remote in time and minimal in nature to support a claim that she made Bucklew's working conditions intolerable causing Bucklew to quit in July 2009.

*targeting* Bucklew's perceived weak spots, including her disabilities (weight and difficulties walking and standing) or sensitivities regarding those disabilities. Even if Long's actions were enough to suggest she was motivated by disability bias (despite Bucklew's testimony), Bucklew has shown no basis on which to attribute this motivation to any higher level manager or Walmart itself, particularly in light of Wally's investigation and cautionary comments.

## CONCLUSION

For the reasons set forth above, the court adopts the Report as modified and supplemented by this order, grants Defendant's motion for summary judgment in full, and directs entry of judgment for Defendant on all claims.

                    s/ Cameron McGowan Currie
                    CAMERON MCGOWAN CURRIE
                    UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
June 18, 2012